**VIRTUAL DEFENSE AND DEVELOPMENT INTERNATIONAL, INC., Plaintiff,**

v.

**The REPUBLIC OF MOLDOVA, Defendant.**

**No. CIV.A.98–161 (RMU).**

United States District Court, District of Columbia.

Feb. 5, 2001.

Order Granting Reconsideration Feb. 20, 2001.

Gary Scott Silverman, Rockville, MD, for Virtual Defense & Dev. Intern., Inc.

Jeffrey Scott Neeley, Manatt, Phelps & Phillips, Washington, DC, for Republic of Moldova.

Herbert Emerson Forrest, U.S. Department of Justice, Federal Programs

Branch, Washington, DC, for Central Intelligence Agency.

Anne L. Weismann, U.S. Department of Justice, Civil Division, Washington, DC, for John Todd Stewart.

Amanda Quester, U.S. Department of Justice, Civil Division, Washington, DC, for Dept. of State, A. Rich Jackson.

## MEMORANDUM OPINION

URBINA, District J.

**Granting in Part and Denying in Part the Defendant's Motion for Summary Judgment; Denying the Plaintiff's Motion for Reconsideration of the Magistrate Judge's Order Regarding the Motion to Compel Testimony; Reserving Judgment on the Plaintiff's Motion for Reconsideration of the Magistrate Judge's Order Regarding the Motion to Compel Production of the State Department Cable; Denying the Plaintiff's Motion to Strike the State Department's Opposition; Denying the Plaintiff's Motion for a Certificate of Appealability of the Magistrate Judge's Order Denying the Motions to Compel Testimony**

## I. INTRODUCTION

At the center of this dispute is a fleet of twenty-one high-performance, Soviet-designed MiG–29 fighter jets. The jets are the most advanced fighters produced by the former Soviet Union; fourteen of them—the model 29C MiG—are capable of launching nuclear weapons. The MiGs' journey from the former Soviet republic of Moldova, a small, landlocked nation tucked between Romania and Ukraine, to Wright–Patterson Air Force Base in Ohio, is a complex tale involving the diversion of sophisticated weaponry from rogue states. The present controversy involves one short (and more quotidian) chapter of this story: the efforts of a private consulting firm to obtain a commission from Moldova's sale of the MiGs to the United States.

Virtual Defense and Development International, Inc. ("VDDI"), a consulting firm in Bethesda, Maryland, has sued the Republic of Moldova ("Moldova") for breach of contract and quantum meruit relating to the sale of the MiGs. This matter is now before the court on defendant Moldova's motion for summary judgment, the plaintiff's motions for reconsideration of several discovery-related orders, the plaintiff's motion to strike the CIA's opposition to one of these motions for reconsideration, and the plaintiff's requests for certificates of appealability pursuant to 28 U.S.C. § 1292(b).

For the reasons stated herein, the court will grant in part and deny in part the defendant's motion for summary judgment. The court will also deny the plaintiff's motion to strike and the plaintiff's motions for reconsideration and for a certificate of appealability regarding the motion to compel testimony. Finally, the court will reserve ruling on the plaintiff's second motion for reconsideration and for a certificate of appealability until the court has had the opportunity to review the subject matter of the motion (a classified State Department cable).

## II. BACKGROUND

### A. Factual History

After the dissolution of the Soviet Union in 1991, Moldova emerged as a sovereign nation in severe economic turmoil. To bolster its economy, Moldova arranged to sell its fleet of MiG–29 fighters to Iran. The United States, alarmed that Iran might acquire such advanced weaponry, offered to purchase the bulk of Moldova's fleet, thereby preventing Iran's acquisition of the MiGs. On November 4, 1997, the United States and Moldova announced the execution of the Cooperative Threat Reduction Agreement, which called for the United States to purchase twenty-one Moldovan MiGs. See Mot. for Summ. J. at 6. The final purchase price was $40 million in cash and $100 million in economic aid.

In early 1998, VDDI filed the instant suit, claiming that it had facilitated the sale of the MiGs to the United States, and was therefore entitled to a commission of $9 million. Moldova countered that a brokerage contract for the sale of the MiGs never existed between the parties in this suit, that VDDI did not perform any services for Moldova, and that Moldova did not receive any value from VDDI's activities relating to the sale of the MiGs. *See* Mot. for Summ. J. at 1–2. Both VDDI and Moldova have offered factual descriptions to support their contentions, and not surprisingly, their descriptions differ in many respects. Nevertheless, for the purposes of this motion, the court will accept the version of the plaintiff who, as the non-moving party, is entitled to have all factual disputes resolved in its favor.

According to the plaintiff, in May and June of 1997, Marty Miller, an international consultant residing in New York, met with Boris Birshtein, an economic advisor to the Moldovan President,[1] at the Plaza Hotel in New York. *See* Opp'n to Mot. to Dismiss, Affidavit of Marty Miller ("Miller Aff.") ¶ 4. At that meeting, Mr. Birshtein offered Mr. Miller "economic opportunities" in Moldova. *See id.* Thereafter, Mr. Miller invited VDDI's representatives to New York to discuss these economic opportunities, and in July 1997, Mr. Miller met with Michael Spak, VDDI's President, to discuss whether VDDI could help Moldova sell its MiG–29 aircraft. *See id.* ¶¶ 5, 7. Later that month, Mr. Birshtein invited Mr. Miller and Mr. Spak to a meeting in Toronto, Canada, so that, among other things, the Moldovans could evaluate VDDI's ability to handle the sale of the MiGs. *See id.* The meeting was held in Toronto on July 30, 1997. In attendance were Mr. Spak, Mr. Miller, and several

Moldovan officials, including Moldova's Ambassador to the United States and the Moldovan Minister of National Security. *See id.* ¶ 9. According to Mr. Miller, the MiG–29s were "briefly discussed."[2] *See id.*

On August 7, 1997, the Moldovan government invited the plaintiff to visit Moldova to discuss the sale of the MiGs and the terms under which the plaintiff would broker the sale. *See* Compl. ¶ 5. The plaintiff accepted the invitation and alerted the Central Intelligence Agency, the Department of State, and the Federal Bureau of Investigation that one of its principals would be traveling to Moldova to facilitate the sale of the MiG–29 aircraft. *See* Opp'n to Mot. for Summ. J., Affidavit of Michael Spak dated Oct. 3, 2000 ("Spak Aff.") ¶ 4. In mid-September 1997, Mr. Spak flew to Moldova on Mr. Birshtein's private plane. *See* Opp'n to Mot. for Summ. J. at 4. Upon arriving in Moldova, he was given a military escort and a V.I.P. diplomatic visa. *See* Spak Aff. ¶ 6. Mr. Spak met with various Moldovan officials, including Valeriu Pasat, the Minister of Defense, and received "valuable information regarding the planes and the previous negotiations between the United States and Moldova." *See id.* ¶¶ 9–10.

On September 17, 1997, while still in Moldova, Mr. Spak entered into an "agreement"—parts of which were written and parts of which were oral—with the defendant. *See* Compl. ¶ 7. Mr. Spak explains that he gave the Moldovan government a written proposed contract, but that Moldova did not sign the contract because, he was told, the Prime Minister does not sign contracts. *See* Spak Aff. ¶ 11. Instead, the Prime Minister gave Mr. Spak a "let-

---

1. Mr. Birshtein served as an economic advisor to the President of the Republic of Moldova from 1992 to 1996. *See* Affidavit of Boris Birshtein dated July 24, 2000 ("Birshtein Aff."), Opp'n to Mot. for Summ. J. ¶ 3. Since 1996, Mr. Birshtein has not held any official position with the government of Moldova. *See id.* ¶ 4.

2. Apparently, the discussions in Toronto centered on the construction of a forensic laboratory in Moldova, for which VDDI had offered its services. *See* Opp'n to Mot. to Dismiss at 2.

ter of authorization to memorialize the agreement reached between VDDI and Moldova."[3] *Id.* ¶ 12. Among other things, the parties agreed that: (1) the plaintiff would represent Moldova in the worldwide sale of the MiG–29 aircraft; (2) the plaintiff would broker a sale of the MiGs primarily to the United States government; and (3) the defendant would pay the plaintiff a fee of 15 percent of the value of the sale, to be paid in U.S. currency. *See* Compl. ¶ 7.

After meeting with the Moldovan government, the plaintiff spoke with the U.S. Ambassador to Moldova, John Todd Stewart, at the American Embassy in Chisinau, Moldova. *See* Opp'n to Mot. for Summ. J. at 5. At this meeting, the plaintiff shared the information that the Moldovan government had given to the plaintiff regarding the MiG–29s. *See id.* The Ambassador then sent a cable to the U.S. Department of State, the CIA and the Pentagon, relaying this information. *See id.* at 5–6. Upon returning to the United States, the plaintiff met with Jackson Rich, the CIA's field officer assigned to Moldova, and various other U.S. government officials, including representatives of the State Department's Moldovan Affairs Office and the U.S. Government Political/Military Affairs Office. The purpose of the meetings was to advise the United States that it should make an offer to Moldova based on the framework provided by the plaintiff. *See* Compl. ¶ 10. In the following weeks, the plaintiff "continued to utilize its extensive

contacts within the United States of America for the purpose of brokering a sale of the MiG–29 Aircraft." *See id.* ¶ 11. The plaintiff does not say precisely how it used these contacts to broker the sale.

The plaintiff further alleges that a "couple weeks" after the formation of "the agreement," the plaintiff "successfully brokered a sale of 21 of the MiG–29 Aircraft from the Defendant to the United States Government." *See id.* ¶ 12. In its complaint, the plaintiff estimates the sale price at $60 million, a price that includes cash and other non-military materials.[4] At some point after the sale, the plaintiff demanded payment from Moldova in the amount of $9 million (representing 15 percent of the estimated sale price), which Moldova refused to pay. According to Mr. Spak, Moldova refused to pay him because he "would not give the Moldovan government officials a 'kick-back.'" *See* Spak Aff. ¶ 17.

Moldova's characterization of the sale differs significantly from the plaintiff's. Moldova claims the sale of the MiGs was a pure government-to-government transaction involving only American and Moldovan government officials and no outside brokers. *See* Mot. for Summ. J. at 3–4. Indeed, Moldova casts Mr. Spak as a peripheral actor who appeared in Moldova at the behest of an unpaid economic advisor, well after the United States and Moldova had reached a final written agreement.

---

**3.** The "letter of authorization" is a letter addressed to Michael Spak, President/CEO of VDDI, dated September 17, 1997, and stating as follows:

> The Government of the Republic of Moldova send [sic] an official letter appointing "Virtual Defense and Development International" for a period with maturity date on the 1st of December 1997 to represent the Republic of Moldova in [sic] worldwide sale of the republic's MIG–29 aircraft.
> On behalf of the Republic of Moldova the Company is provided with authorization to initiate and sustain discussions with governments and/or private business entities concerning the realization of these air-

crafts. This authorization is provided taking into account that this deal will be carried out with partners from the United States of America or other states with the authorization of the USA [sic] government. Compl., Ex. A. The letter is signed by Ion Ciubuc, Prime Minister of the Republic of Moldova.

**4.** VDDI acknowledges that it was never informed of the actual sale price, and that $60 million was only an estimate on its part. *See* Opp'n to Mot. to Dismiss at 3. Indeed, Moldova states—and VDDI does not dispute—that the United States paid $40 million in cash and $100 million in foreign aid. *See* Decl. of Valeriu Pasat ¶ 8.

*See id.* at 4. Thus, Moldova contends that since a contract never existed between the parties, VDDI cannot maintain a claim for breach of contract, and since VDDI never performed any services for Moldova, VDDI does not have a claim under quantum meruit. *See id.* at 7.

### B. *Procedural History*

In August 1998, Moldova filed a motion to dismiss the complaint on the grounds that the court lacked jurisdiction under the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1602 *et seq.*, and that the act-of-state doctrine [5] required the court to abstain from hearing the case. By Order dated March 31, 1999, the court denied Moldova's motion to dismiss. Specifically, the court ruled that the commercial-activity exception to the FSIA provided the court with jurisdiction over Moldova for purposes of the suit, and that Moldova had not met its burden of showing that the act-of-state doctrine applied to this case. *See* Mem. Op. dated May 10, 1999.

In the months following the denial of the motion to dismiss, the parties became entangled in several discovery-related disputes. These disputes came to the court's attention through various (non-consent) motions to extend discovery deadlines and to compel testimony. On October 2, 2000, the court referred the case to U.S. Magistrate Judge Alan Kay for resolution of all discovery disputes. After hearing argument on these matters, Judge Kay denied the plaintiff's Motion to Compel Testimony of Ambassador John Todd Stewart and the plaintiff's Motion to Compel Testimony of Mr. A. Jackson Rich. *See* Mem. Order dated Oct. 24, 2000(AK). With respect to the plaintiff's Motion to Compel Disclosure of Cable from Ambassador Stewart to the Department of State, Judge Kay conduct-

ed an *in camera* review of the unredacted cable, and shortly thereafter, denied the plaintiff's motion. *See* Mem. Order dated Oct. 25, 2000(AK); Order dated Nov. 1, 2000(AK). The plaintiff now moves for reconsideration of Judge Kay's rulings on these discovery issues. Before turning to the plaintiff's motion for reconsideration, however, the court will address the defendant's motion for summary judgment.

## III. DISCUSSION OF MOTION FOR SUMMARY JUDGMENT

### A. *Legal Standard*

Summary judgment is appropriate when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no issue as to any material fact and that the moving party is entitled to summary judgment as a matter of law." FED. R. CIV. P. 56(c). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

The party seeking summary judgment bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the record, if any, that demonstrate the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). It is only after the moving party has demonstrated the absence of any issue of material fact that the burden shifts to the nonmoving party to demonstrate that an issue of material fact exists. *See Greenberg v. FDA,* 803 F.2d 1213, 1215–16 (D.C.Cir.1986). At that point, the nonmov-

---

**5.** The act of state doctrine is similar to the political question doctrine in domestic law. It aims to keep courts "from deciding a case when the outcome turns upon the legality or illegality (whether as a matter of United States, foreign, or international law) of official action by a foreign sovereign performed within its own territory." *Riggs Nat'l Corp. & Subsidiaries v. Comm'r of IRS,* 163 F.3d 1363, 1367 (D.C.Cir.1999) (citing *W.S. Kirkpatrick & Co., Inc. v. Envtl. Tectonics Corp.,* 493 U.S. 400, 406, 110 S.Ct. 701, 107 L.Ed.2d 816 (1990)).

ing party must "go beyond the pleadings and ... designate specific facts showing that there is a genuine issue for trial." *See Celotex*, 477 U.S. at 324, 106 S.Ct. 2548.

Because summary judgment is a "drastic remedy," the court "should grant it with caution so that no person will be deprived of his or her day in court to prove a disputed material factual issue." *Greenberg*, 803 F.2d at 1216. For this reason, the court must accept the evidence of the nonmoving party as true and draw all justifiable inferences in favor of the nonmoving party. *See Anderson*, 477 U.S. at 255, 106 S.Ct. 2505. "If the evidence presented on a dispositive issue is subject to conflicting interpretations, or reasonable persons might differ as to its significance, summary judgment is improper." *Greenberg*, 803 F.2d at 1216. It is not sufficient, however, for the nonmoving party to establish a "mere scintilla of evidence in support of [its] position." *See Anderson*, 477 U.S. at 252, 106 S.Ct. 2505. Rather, "there must be evidence on which the jury could reasonably find for the plaintiff." *Id.*

## B. *Analysis*

### 1. Choice of Law

■ As a preliminary matter, the court must determine which substantive law to apply in this matter. Both parties have assumed, without any discussion, that this matter is governed by the substantive law of the District of Columbia. The FSIA, however, while providing a basis for jurisdiction in this court, does not provide for a federal substantive rule of decision, nor does it contain an express choice-of-law provision. Indeed, the primary function of the FSIA is: (1) to provide comprehensive standards governing access to federal and state courts for plaintiffs asserting claims against foreign states and their instrumentalities; and (2) to grant federal district courts original jurisdiction over any civil claims against a foreign state for which there is no immunity under the Act and to give foreign states the right to remove any such action brought in state court to federal district court. *See Dar El–Bina Eng'g & Contracting Co., Ltd. v. Republic of Iraq*, 79 F.Supp.2d 374, 379 (S.D.N.Y. 2000).

■ The Supreme Court has held that as a general matter, state substantive law is controlling in FSIA cases. *See First Nat'l City Bank v. Banco Para El Comercio Exterior De Cuba*, 462 U.S. 611, 622 n. 11, 103 S.Ct. 2591, 77 L.Ed.2d 46 (1983) ("where state law provides a rule of liability governing private individuals, the FSIA requires the application of that rule to foreign states in like circumstances"). As the *Dar El–Bina* court has explained, this holding conforms with Congress's intent to make a foreign state "liable [under the FSIA] in the same manner and to the same extent as a private individual under like circumstances." *See Dar El–Bina*, 79 F.Supp.2d at 383 (citing 28 U.S.C. § 1606 (FSIA)). The goal of applying identical substantive laws to foreign states and private individuals cannot be achieved, however, unless a federal court utilizes the same choice-of-law analysis in FSIA cases as it would if all the parties to the action were private. *See Barkanic v. Gen. Admin. of Civil Aviation of the People's Republic of China*, 923 F.2d 957, 959–60 (2d Cir.1991). Consequently, the FSIA requires courts to utilize the choice-of-law analysis of the forum state with respect to all issues governed by state substantive law. *See Dar El–Bina*, 79 F.Supp.2d at 383; *see also Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941) (federal courts sitting in diversity must apply the choice-of-law rules of the forum state).

■ The District of Columbia's choice-of-law rules instruct that in the absence of an effective choice of law by the parties, the court uses "a constructive blending" of the "governmental interest analysis" and "the most significant relationship test," the latter expressed in the Restatement (Sec-

ond) of Conflict of Laws § 188 (1988).[6] *See Stephen A. Goldberg Co. v. Remsen Partners, Ltd.*, 170 F.3d 191, 194 (D.C.Cir. 1999) (citing *Hercules & Co., Ltd. v. Shama Restaurant Corp.*, 566 A.2d 31, 41 n. 18 (D.C.1989)); *see also Ideal Elec. Sec. Co. v. Int'l Fid. Ins. Co.*, 129 F.3d 143, 148 (D.C.Cir.1997) (stating that the District of Columbia applies the Restatement (Second) § 188 to contracts cases). Section 188 of the Restatement names five factors as determinants of a "significant relationship": (1) the place of contracting; (2) the place of negotiation; (3) the place of performance; (4) the location of the subject matter of the contract; and (5) the domicile, residence, nationality, place of incorporation, and place of business of the parties. *See Stephen A. Goldberg Co.*, 170 F.3d at 194 (citing Restatement § 188). For the validity of a service contract, however, the Restatement assigns presumptive weight to factor three—the place where the services are to be rendered—because this is most likely to correspond to the assumptions of the parties and to allow control by the state with the greatest interest. *See id.* (citing Restatement § 196).

In the instant matter, the plaintiff alleges that "it was understood and intended by Plaintiff and the Defendant that the Plaintiff's efforts on behalf of the Defendant would occur wholly or principally within the United States." Compl. ¶ 6. Indeed, with the exception of the plaintiff's meeting with Ambassador Stewart at the American Embassy in Moldova, the plaintiff performed its alleged services (namely, meeting with various U.S. government officials) entirely in the United States. Accordingly, under Section 188, this gives

rise to a presumption that District of Columbia law will govern.

D.C. courts also inquire independently into which jurisdiction has the greatest interest in the subject. *See Stephen A. Goldberg Co.*, 170 F.3d at 194; *see also District of Columbia Ins. Guar. Ass'n v. Algernon Blair, Inc.*, 565 A.2d 564, 568 (D.C.App.1989); *Kaiser–Georgetown Cmty. Health Plan, Inc. v. Stutsman*, 491 A.2d 502, 509 (D.C.App.1985). Certainly, both the District of Columbia and Moldova have an interest in the laws governing this subject, and the parties have not alleged that either jurisdiction has a *greater* interest than the other. In such cases, where the interests of both jurisdictions appear equally weighty, efficiency concerns tilt the balance in favor of applying the law of the forum state, presumably because the forum courts have more experience with their own law. *See Stephen A. Goldberg Co.*, 170 F.3d at 195 (citing *Kaiser–Georgetown*, 491 A.2d at 509 n. 10). The court certainly has more experience with District of Columbia law than with the law of Moldova. In conclusion, and in the absence of any arguments by the parties to the contrary, the court holds that the contractual matters in this case are governed by D.C. law.

### 2. Breach of Contract Claim

" 'A contract is a promise or set of promises for the breach of which the law gives a remedy, or the performance of which the law in some way recognizes as a duty.' " *Henke v. Dep't of Commerce*, 83 F.3d 1445, 1450 (D.C.Cir.1996) (citing Restatement (Second) of Contracts (1979) § 1). "A contract has certain essential elements, to wit, competent parties, lawful subject matter,

6. In addition, as a threshold inquiry, the District of Columbia determines whether a "true conflict" exists. *See GEICO v. Fetisoff*, 958 F.2d 1137, 1141 (D.C.Cir.1992). The true-conflict test asks whether more than one jurisdiction has a potential interest in having its law applied and, if so, whether the law of the competing jurisdiction is different. *See id.* If there is a true conflict, the court must determine which of the relevant jurisdictions has

the "more substantial interest" in having its law applied to the case under review. *See id.* (citing *Eli Lilly & Co. v. Home Ins. Co.*, 764 F.2d 876, 882 (D.C.Cir.1985)). Because the parties have not discussed how the law of Moldova compares to the law of the District of Columbia, the court will assume *arguendo* that there is a true conflict, and will proceed to the "substantial interest" inquiry.

legal consideration, mutuality of assent and mutuality of obligation." *Id.* (citations omitted). For an enforceable contract to exist under D.C. law, there must be agreement as to all material terms and an intention of the parties to be bound. *See Georgetown Entm't Corp. v. District of Columbia,* 496 A.2d 587, 590 (D.C.1985) (citing *Edmund J. Flynn Co. v. LaVay,* 431 A.2d 543, 546–47 (D.C.1981)). The contract "must be sufficiently definite as to its material terms (which include, *e.g.,* subject matter, price, payment terms, quantity, quality, and duration) that the promises and performances to be rendered by each party are reasonably certain." *Rosenthal v. Nat'l Produce Co., Inc.,* 573 A.2d 365, 370 (D.C.1990) (citing J.D. CALAMARI & J.M. PERILLO, THE LAW OF CONTRACTS, § 2–13, at 43–44 & n. 17 (2d ed.1977)). The party asserting the existence of an enforceable contract—in this case, the plaintiff—bears the burden of proof on the issue of contract formation. *See Jack Baker, Inc. v. Office Space Dev. Corp.,* 664 A.2d 1236, 1238 (D.C.1995) (citing *Allied Sheet Metal Works, Inc. v. Kerby Saunders, Inc.,* 206 A.D.2d 166, 169, 619 N.Y.S.2d 260 (N.Y.A.D.1994)).

The defendant argues that no contract ever existed between the parties. *See* Mot. for Summ. J. at 8. According to the defendant, the undisputed material facts show that the key elements of contract formation—an offer, acceptance, a "meeting of the minds," definiteness of essential material terms, intent of the parties to be bound, and consideration—are lacking. *See id.* at 9. Indeed, the defendant states

that "all VDDI received from the Prime Minister was a simple letter of introduction; lacking all essential elements it was not a contract." *Id.* at 10.

■ The plaintiff does not dispute that the "letter of authorization" [7] lacks the material terms of an enforceable contract. Rather, the plaintiff claims that the letter of authorization "merely evidences the *oral* agreement reached between the two parties." *See* Opp'n to Mot. for Summ. J. at 9–10 (emphasis added). The plaintiff correctly notes that in the District of Columbia, "absent any contrary requirement under a statute of frauds, parties may enter into enforceable oral contracts, as long as they agree to all material terms and intend to be bound by their oral agreement." [8] *Jack Baker, Inc.,* 664 A.2d at 1238. Indeed, in *Jack Baker,* the court explicitly stated that "parties may be bound by their oral agreement if it meets the dual requirements of intent and completeness." *Id.; see generally* 1 ARTHUR L. CORBIN, CORBIN ON CONTRACTS §§ 2.8, 2.9 (1993). Thus, the issue remains whether the plaintiff has shown all the material terms of a contract and the intent to be bound, albeit in non-written form.

■ "A necessary step in the formation of any contract is the making of an offer creating in the offeree the power of acceptance." *Maurice Elec. Supply Co., Inc. v. Anderson Safeway Guard Rail Corp.,* 632 F.Supp. 1082, 1087 (D.D.C.1986). "An offer must be definite and certain, and must be made under circumstances evidencing the express or implied intent of the offeror

---

**7.** The defendant refers to this letter as a "letter of introduction." For the sake of clarity, and because the court must resolve all inferences in favor of the plaintiff, the court will use the plaintiff's nomenclature and refer to this letter as a "letter of authorization."

**8.** Because the defendant has not raised the statute of frauds, the court will not consider whether it is a defense to the alleged oral contract here. The statute of frauds was devised "not as a mandatory directive to reduce to writing any oral contract which comes under the statute on pain of forever foregoing

the right to enforce it, but, rather, as an optional defense that the party being charged may invoke to prevent the enforcement of unfounded claims against him." *Hackney v. Morelite Constr.,* 418 A.2d 1062, 1066 (D.C. 1980). For this reason, the defense may be lost if not affirmatively pleaded. *See id; see also* FED. R. CIV. P. 8(c) ("In pleading to a preceding pleading, a party shall set forth affirmatively ... statute of frauds ... and any other matter constituting an avoidance or affirmative defense").

that its acceptance shall constitute a binding contract." *Id.* Moldova argues that it never made an offer to VDDI to broker the sale of the twenty-one MiGs. The court has searched the record and found that although the plaintiff claims that it "entered into an agreement" with the defendant, *see* Compl. ¶ 7, the plaintiff does not allege any facts that would allow the court to infer that there was an offer. And while it is true that on a motion for summary judgment the court must accept the plaintiff's well-pled factual allegations as true, the court is not required to accept the plaintiff's legal conclusion that the parties entered into an "agreement." *See, e.g., M.K. v. Tenet,* 99 F.Supp.2d 12, 17 (D.D.C.2000) (on motion to dismiss, the court is not required to accept inferences unsupported by the facts alleged, nor need it accept legal conclusions that are cast as factual allegations); *accord Jung v. Nationwide Mut. Fire Ins. Co.,* 949 F.Supp. 353, 362 (E.D.Pa.1997) (same).

Even if the court were to infer that there had been an offer, the plaintiff still would not be able to establish the existence of an enforceable contract. This is because the plaintiff does not allege, with sufficient definiteness, that the parties agreed (orally or in writing) to any necessary material terms. As this court has noted, under D.C. law, if "an agreement reached between the parties fails to contain a material term or leaves such a term to future negotiation, then there is no contract." *International Cargo Mgt. Specialists, Inc. v. EG&G Dynatrend, Inc.,* 1995 WL 170376, *14 (D.D.C.1995); *see also Shopping Ctr. Group, Inc. v. Western Dev.*

*Corp.,* 1988 WL 9597, *2 (D.D.C.1998) ("a contract must be precise enough for a court to ascertain the existence of a breach and formulate a remedy").

In several cases, the D.C. courts have declared agreements unenforceable because their terms lacked certainty. For example, in *Stansel v. American Security Bank,* the court held that the parties had failed to "offer[ ] evidence of any such specific terms of the alleged agreement, such as the exact amount of the loans, the interest rates, terms of payment, or manner of performance," and thus their claim failed for "lack of certainty of the contract's terms." *See* 547 A.2d 990, 993 (D.C.1988), *cert. denied,* 490 U.S. 1021, 109 S.Ct. 1746, 104 L.Ed.2d 183 (1989). Similarly, in *Rosenthal v. National Produce Co.,* the court found that a contract between a produce supplier and a restaurant was unenforceable because there "was no stated agreement as to price, quantity, quality, or duration." *See* 573 A.2d 365, 370 (D.C.1990). The court explained that "[r]easonable definiteness in the essential terms of a purported contract ... must be a precondition for its enforceability, for otherwise the court has no adequate means of identifying the obligations which it should enforce." *Id.*

Although the plaintiff insists there was an oral contract between the parties, the plaintiff does not allege that there was a meeting of the minds as to any number of elements. For example, the plaintiff does not discuss the method or timing of payment, which of the MiGs were to be sold, the number and cost of MiGs to be sold,[9]

---

9. In a letter dated September 29, 1997, and addressed to Talal Al-Othman, the plaintiff represents itself as the "exclusive broker to sell [*twenty-seven* ] Russian MIG–29 Fulcrum aircraft." *See* Opp'n to Mot. for Summ. J., Ex. J at 1 (emphasis added). The plaintiff further instructs Mr. Al-Othman:

Please notify the Kuwait, Saudi National Guard, and any other air force in the region of your (our) ability to broker this deal. They may want them because they are immediately available for their defensive

needs, or to form "aggressor" squadrons so that their air forces can train adequately to defend against this MIG–29 aircraft.

On a personal/business note, I can probably give you a commission of US$200,000–250,000 per aircraft so if you can sell 6 to Saudi and six to Kuwait, a nice payday will await us both.

*Id.* at 2. This letter suggests several ambiguities. Most notably, the plaintiff speaks of twenty-seven MiGs, when the actual sale to the United States was for twenty-one MiGs. In

the manner of performance, or the precise role of the plaintiff. Indeed, with respect to the plaintiff's role in the deal, the plaintiff makes vague and contradictory assertions, claiming in its complaint to have "brokered" the sale of the MiGs, *see* Compl. ¶¶ 11–12, and contending in its Opposition that it was neither "an intermediary or negotiator" but rather a "facilitator." *See* Opp'n to Mot. for Summ. J. at 8. The plaintiff does not define either of these terms. In any event, whether the plaintiff "facilitated" or "negotiated" the deal, the plaintiff does not explain why it estimated the final purchase price as $80 million less than the actual price.

The facts alleged by the plaintiff do not allow the court to infer that a meeting of the minds existed as to the kinds of details typically present in a contract, particularly a contract involving the sale of military aircraft from one sovereign to another. *Cf. Greyhound Lines v. Bender*, 595 F.Supp. 1209, 1223 (D.D.C.1984) ("failure to agree on or even discuss an essential term of a contract may indicate that the mutual assent required to make or modify a contract is lacking") (citing *Owen v. Owen*, 427 A.2d 933, 937 (D.C.1981) (citations omitted); *Novecon, Ltd. v. Bulgarian–American Enter. Fund*, 967 F.Supp. 1382, 1387 (D.D.C.1997) (negotiations involving a complex real estate transaction in a foreign country is one "usually put in writing" and involving numerous details), *aff'd*, 190 F.3d 556 (D.C.Cir.1999), *cert. denied*, 529 U.S. 1037, 120 S.Ct. 1531, 146 L.Ed.2d 346 (2000). Accordingly, since no reasonable trier of fact could find that a binding contract existed here, the court will grant the defendant summary judgment on the breach-of-contract claim.

### 3. Quantum Meruit Claim

■ "The term quantum meruit may refer to either an implied contractual [duty] or a quasi-contractual duty requiring compensation for services rendered." *Edmund J. Flynn Co. v. LaVay*, 431 A.2d 543, 549 n. 5 (D.C.1981). Under District of Columbia law, the plaintiff must demonstrate four elements to recover on a claim of quantum meruit:

(1) valuable services must be rendered by the plaintiff; (2) for the person sought to be charged; (3) which services were accepted by the person sought to be charged and enjoyed by him or her; and (4) under such circumstances as reasonably notified the person sought to be charged that the plaintiff, in performing such services, expected to be paid.

*TVL Assoc. v. A & M Constr. Corp.*, 474 A.2d 156, 159 (D.C.1984) (citing *In re Rich*, 337 A.2d 764, 766 (D.C.1975)). As the D.C. Court of Appeals has explained, a promise to pay will be implied in law when one party renders valuable services that the other party knowingly and voluntarily accepts. *See Brown v. Brown*, 524 A.2d 1184, 1186 (D.C.1987).

■ Moldova argues that VDDI did not provide any services, much less valuable services, to Moldova. *See* Mot. for Summ. J. at 17–18. Moldova cites the testimony of several American and Moldovan officials, including Minister Pasat and Dr. Jeffrey Starr, Principal Director of Threat Reduction Policy and the Acting Principal Deputy Assistant Secretary of Defense for International Security Policy in the U.S. Defense Department. According to Moldova, "Dr. Starr and Minister Pasat confirm the fact that neither Mr. Spak nor VDI played any role whatsoever in the sale of the Moldovan MIG–29s to the United States." Mot. for Summ. J. at 18. Although Moldova elucidates many important facts suggesting that VDDI did not perform valuable services, these are facts as to which there *is* genuine dispute. The court, therefore, is constrained by the

---

addition, the court notes that in its Complaint, the plaintiff had stated it was designated as the broker of a deal to sell MiGs "primarily" to the United States. *See* Compl. ¶ 7.

In this letter, however, the plaintiff indicates that it would be able to sell nearly half the total number of MiGs to Kuwait and Saudi Arabia.

summary-judgment standard, and must accept the *plaintiff's* allegations as true. The plaintiff alleges, under oath, that it contacted various members of the United States government and relayed the terms that Moldova would accept for the purchase of the planes, "thereby reviving the deal between the two countries." *See* Opp'n to Mot. for Summ. J. at 13. Whether the plaintiff actually performed these services, and whether they were of any value is a genuine issue of material fact that the court cannot resolve on a motion for summary judgment.

The same can be said for the third and fourth quantum-meruit factors: the plaintiff alleges that Moldova sought and accepted its services, and benefited from the services through the sale of the 21 MiG fighters. To prevail on a claim of quantum meruit, the "claimant must be able to show that its services resulted in [an] actual benefit to the defendant." *Novecon*, 967 F.Supp. at 1389 (citing 2: E. Allan Farnsworth, Farnsworth on Contracts, § 3.26a at 314) (internal citations omitted). There is no dispute that Moldova was able to sell its MiGs to the United States; it is not clear, however, whether the sale was in any way attributable to services that VDDI performed.

Accordingly, because the defendant has not met its burden of showing that there is no genuine issue as to these material facts, the court must deny the defendant's motion for summary judgment on the plaintiff's quantum meruit claim.

10. The plaintiff has moved to strike the last ten pages of the State Department and CIA's twenty-page Opposition on the ground that the it is too long. The sole legal basis for the plaintiff's motion is the court's Initial Scheduling and Procedures Order, which states that motions for reconsideration "shall not exceed ten pages in length." *See* Order dated Aug. 24, 1999 at 4. The plaintiff's suggestion that it is "prejudiced by being limited to ten (10) pages in its initial motion and by allowing the State Department and [CIA] to respond with twenty pages" is unpersuasive. *See* Mot. to

## II. DISCUSSION OF MOTIONS FOR RECONSIDERATION

### A. *Legal Standard*

Under Federal Rule of Civil Procedure 72(a) and Local Civil Rule 72.2, a party may seek reconsideration of a magistrate judge's determination in a discovery dispute. *See* FED. R. CIV. P. 72(a); L.Cv.R. 72.2. On review, the magistrate judge's decision is entitled to great deference and will be upheld unless "clearly erroneous or contrary to law." *See Neuder v. Battelle Pacific Northwest Nat'l Lab.*, 194 F.R.D. 289, 292 (D.D.C.2000); *Boca Investerings Partnership v. United States*, 31 F.Supp.2d 9, 11 (D.D.C.1998). This standard requires the court to affirm the magistrate judge's determination unless "on the entire evidence" the court is left with the definite and firm conviction that a mistake has been committed. *See United States v. United States Gypsum Co.*, 333 U.S. 364, 68 S.Ct. 525, 92 L.Ed. 746 (1948); *see also Neuder*, 194 F.R.D. at 292.

### B. *Analysis*

#### 1. The Depositions Order

On November 1, 2000, Magistrate Judge Kay denied the plaintiff's motions to compel the testimony of A. Jackson Rich and Ambassador Stewart. On November 6, 2000, the plaintiff filed a motion for reconsideration of Judge Kay's order, which the defendant, the State Department and the CIA have all opposed.[10] Although the plaintiff's motion for reconsideration has done nothing more than restate its previ-

Strike ¶ 7. The court's Scheduling Order does not place any limitation on *oppositions* to motions for reconsideration. Moreover, the Local Rules provide that a "memorandum of points and authorities in support of or in opposition to a motion shall not exceed 45 pages and a reply memorandum shall not exceed 25 pages without prior approval of the court." LCvR 7.1(e). Because the State Department's Opposition does not exceed 45 pages, the court will deny the plaintiff's motion to strike.

ous position, the court will briefly review Judge Kay's decision, mindful of the highly deferential standard of review.

Congress has authorized federal agencies to enact regulations establishing agency policy and procedures regarding requests for testimony about official agency activities. *See* 5 U.S.C. § 301; *see also United States ex rel. Touhy v. Ragen*, 340 U.S. 462, 71 S.Ct. 416, 95 L.Ed. 417 (1951) (upholding such regulations as a valid exercise of statutory authority). In the case of the CIA and State Department, the so-called *Touhy* regulations provide that current and former employees of the agencies may not testify in response to non-party subpoenas regarding information acquired as part of their official duties without the agencies' specific authorization. *See* 22 C.F.R. Part 72, § 172.5; 32 C.F.R. Part 1905.

Ambassador Stewart was an employee of the State Department during his tenure as the U.S. Ambassador to Moldova. *See* State Dept. & CIA Opp'n to Pl.'s Mot. for Recons. at 3. Mr. Rich began working for the CIA in 1962 and between 1996 and 1998 served as a general intelligence officer assigned to a geographic region encompassing Moldova. *See id.* The plaintiff served non-party subpoenas on Ambassador Stewart and Mr. Rich, noticing on their depositions for August 16, 2000. In letters to the State Department office of Legal Advisor and the CIA Office of General Counsel, Shawn Whittaker, counsel for the plaintiff, informed both agencies that "pursuant to the *Touhy* regulations":

> The Plaintiff seeks to depose Mr. Stewart [Mr. Rich] on three issues: the initial terms of the sale of the MIG–29 planes; the final terms of the sale of the MIG–29 planes; and whether the negotiations between the United States and Moldova ever reached an impasse or the negotiations broke-down [sic] in some manner.

*Id.* (citing Letters from Shawn C. Whittaker dated Aug. 12, 2000) ("Whittaker Letters").

Thereafter, Deputy Legal Advisor Ronald Bettauer informed Ambassador Stewart that he had been authorized to be deposed in the manner set forth in the plaintiff's letter, adding the following qualification:

> This authorization is limited to factual testimony on matters within your personal recollection, *solely on the subjects enumerated in Mr. Whittaker's letter*, and does not extend to providing any expert or opinion testimony based upon information acquired by you in the course of your official duties. You are specifically directed not to divulge any classified information or information regarding internal deliberative processes of the ... Executive Branch.

*Id.* (citing Letter from Ronald Bettauer dated Aug. 16, 2000). CIA Associate General Counsel Kathleen McGinn similarly informed Mr. Rich that he could be deposed "solely" on the three issues identified by the plaintiff. *See id.* (citing Letter from Kathleen McGinn dated Aug. 21, 2000).

In its motion to compel the testimony of Ambassador Stewart, the plaintiff argued that the Ambassador did not answer certain questions that fell within the scope of his authorized testimony. Ambassador Stewart opposed the motion on the ground that he did in fact testify on all three areas requested by the plaintiff. *See* Stewart Opp'n at 8 ("Ambassador Stewart specifically testified that there was no breakdown [in negotiations between the U.S. and Moldova] and that he could not recall either the initial or final terms of the sale"). Judge Kay examined the deposition transcript and found the plaintiff's argument unpersuasive. As Judge Kay stated: "The transcript reflects that Ambassador Stewart was in fact asked, and did in fact answer, questions as to all three areas requested by Plaintiff." *See* Mem. Order dated Oct. 24, 2000(AK) at 3–4.

The court agrees with Judge Kay that while "the Ambassador's answers are brief ... and undoubtedly unhelpful to the Plaintiff, the record shows that the witness responded to the issues delineated in Plaintiff's request for testimony and asked by Plaintiff in the deposition." *Id.* at 4. The Federal Rules of Civil Procedure and the State Department's *Touhy* regulations provide that parties seeking testimony from non-party witnesses must specify the particular matters on which examinations requested before the deposition. *See* FED. R. CIV. P. 30(b)(6); 22 C.F.R. § 172.5. The plaintiff sought testimony from the Ambassador on three specified areas and the record reflects that the plaintiff took testimony on those areas. The language of the plaintiff's request for testimony does not support its contention that Ambassador Stewart should have testified to a meeting he had with Mr. Spak in which the two allegedly discussed the MiGs. Indeed, the plaintiff's letter to the State Department requesting testimony from the Ambassador says nothing about meetings between the plaintiff and the Ambassador. *See* Order dated Oct. 24, 2000(AK) at 5 (citing Whittaker Letters).

Mr. Rich has adopted the same defense to the plaintiff's motion to compel as Ambassador Stewart. The court finds that Judge Kay's reasoning, which was both well reasoned and fully supported by the record, applies with equal force to Ambassador Stewart and Mr. Rich. Accordingly, the court determines that Judge Kay's order was not "clearly erroneous or contrary to law."

■ The plaintiff also asks that should the court deny its motion for reconsideration, the court certify that Judge Kay's ruling for an interlocutory appeal pursuant to 28 U.S.C. § 1292(b). This section provides, in pertinent part:

> When a district judge, in making a civil action an order not otherwise appealable under this section, shall be of the opinion that such order involves a controlling question of law as to which there is a

substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation, he shall so state in writing in such order. 28 U.S.C. § 1292(b). Thus, to establish a basis for an interlocutory appeal of a nonfinal order, the moving party must demonstrate three elements: (1) that the issue involves a controlling question of law; (2) that substantial contrary authority or other grounds for a difference of opinion exist; and (3) that immediate appeal would materially advance the ultimate determination of the litigation. *See Trout v. Garrett, III*, 891 F.2d 332, 335 n: 5 (D.C.Cir.1989).

■ Although courts have discretion to certify an issue for interlocutory appeal, *see id.* at 353, interlocutory appeals are rarely allowed. *See First American Corp. v. Al-Nahyan*, 948 F.Supp. 1107 (D.D.C. 1996) (citations omitted). Indeed, the movant "bears the 'burden of showing that exceptional circumstances justify a departure from the basic policy of postponing appellate review until after the entry of a final judgment.'" *Id.* (citing *Chalfin v. Beverly Enter., Inc.*, 745 F.Supp. 1117, 1122 (E.D.Pa.1990)). This case does not involve any of the circumstances that have led this court to certify interlocutory appeals in other cases. For example, in *Johnson v. Wash. Metro. Area Transit Auth.*, the court found that a possible inconsistency between the Circuit's holding in an earlier appeal in the case and the Circuit's holding in a different case justified certifying the issue for interlocutory review. *See Johnson*, 773 F.Supp. 459, 460 (D.D.C.1991). The court also found that resolution of this apparent intra-circuit split would materially advance the ultimate termination of the litigation by possibly negating the need for a jury trial. *See id.* at 461. By contrast, in the present case, the court has not based its ruling on a disputed question of law, but on the fact that the plaintiff's request for additional testimony does not fall within the plain language of the plaintiff's original request.

Because substantial grounds for difference of opinion with the court's holdings do not exist, and the movant has not met its burden of showing "exceptional circumstances," the court will deny the plaintiff's motion for certification under 28 U.S.C. § 1292(b).

### 2. The Cable Order

On September 22, 2000, the plaintiff moved to compel disclosure of an unredacted, classified cable from Ambassador Stewart to the State Department concerning the Ambassador's meeting with Michael Spak. On November 1, 2000, after conducting an *in camera* review of the unredacted cable, Magistrate Judge Kay held that the State Department had properly invoked the state secrets privilege. Accordingly, Judge Kay denied the plaintiff's motion to compel disclosure of the unredacted cable. The plaintiff has now filed a motion for reconsideration of Judge Kay's order, or in the alternative, a certificate of appealability pursuant to 28 U.S.C. § 1292(b).

The cable from the Ambassador is classified as a Secret/NODIS cable. *See* State Dept.'s Opp'n to Mot. to Compel Disclosure of Cable, Ex. A ¶ 4. This is the second-highest level of U.S. government classification for documents under Executive Order 12958, § 1.3(a) (April 17, 1995). *See id.* Under the Executive Order, the Secret Classification "shall be applied to information, the unauthorized disclosure of which reasonably could be expected to cause serious damage to the national security." *Id.* The "NODIS" caption means "no distribution to other than addressee without the approval of the [State Department] Executive Secretary," and is reserved for "messages of the highest sensitivity between the President, the Secretary of State, and chiefs of mission." *Id.* (citing 12 Foreign Affairs Manual 539.3).

The State Department opposed the plaintiff's motion to compel disclosure on the ground that the state secrets privilege protects the unredacted portions of the cable from disclosure. The "state secrets" privilege is a common-law privilege that protects information from discovery when disclosure "would result in 'impairment of the nation's defense capabilities, disclosure of intelligence-gathering methods or capabilities, [or] disruption of diplomatic relations with foreign governments.'" *See In re United States,* 872 F.2d 472, 474 (D.C.Cir.1989) (internal citations omitted). As Judge Kay explained, the case law delineates the way the privilege may be invoked: the head of the governmental department having control over the matter must lodge a formal claim of privilege, generally in the form of affidavit, after actual personal consideration of the matter. *See* Mem. Order dated Oct. 25, 2000(AK) (citing *United States v. Reynolds,* 345 U.S. 1, 7–8, 73 S.Ct. 528, 97 L.Ed. 727 (1953)). Once the privilege has been formally claimed, the court must balance the "executive's expertise in assessing privilege on the grounds of military or diplomatic security" against the mandate that a court "not merely unthinkingly ratify the executive's assertion of absolute privilege, lest it inappropriately abandon its important judicial role." *See In re United States,* 872 F.2d at 475, 476 (internal citations omitted). "Judicial control over the evidence in a case cannot be abdicated to the caprice of executive officials." *See id.* (quoting *Reynolds,* 345 U.S. at 9–10, 73 S.Ct. 528).

In his Order denying the plaintiff's motion to compel production of the cable, Judge Kay did not set forth his reasons for upholding the government's invocation of the state secrets doctrine. *See* Order dated Nov. 1, 2000(AK). The court presumes that the classified nature of the cable constrained Judge Kay's ability to articulate his reasoning publicly. Because the court has no basis, however, for evaluating Judge Kay's reasoning, the court will reserve its ruling on the plaintiff's motion for reconsideration until it can conduct an independent review of the cable.

## III. CONCLUSION

For the foregoing reasons, the court will grant the defendant's motion for summary judgment with respect to the plaintiff's breach-of-contract claim but will deny the motion with respect to the plaintiff's quantum-meruit claim. The court will also deny the plaintiff's motions for reconsideration of Magistrate Judge Kay's order relating to the testimony of Ambassador Stewart and Jackson Rich, the plaintiff's motion to strike the State Department's Opposition, and the plaintiff's request that the court certify this issue to the Court of Appeals. The court will reserve ruling on the plaintiff's motion for reconsideration of Magistrate Judge Kay's order relating to the State Department cable until the court has independently reviewed the cable *in camera*.

### ORDER

**Granting in Part the Plaintiff's Motion for Reconsideration of Magistrate Judge Kay's Order Regarding the Motion to Compel Production of the State Department Cable**

On February 5, 2001, the court issued a Memorandum Opinion and Order addressing, among other things, the plaintiff's motion for reconsideration of Magistrate Judge Kay's order denying the plaintiff's motion to compel production of a classified State Department cable. The court ruled that it would hold this motion in abeyance until it had an opportunity to conduct an *in camera* review of the cable. On February 8, 2001, the court conducted an *in camera* review of the cable. At that time the court determined that the United States Department of State had inappropriately withheld two sentences in this cable.

On February 15, 2001, at the request of the court, the State Department declassified and released two additional sentences of the cable. The newly declassified material appears in paragraph 2 of the cable ("I repeat my request, therefore, for instruc-

tions to proceed with an offer for the 21 MIG's which supposedly remain unsold") and on the last page of the cable ("that I be instructed to give the Moldovans an offer for 21 MIG's with a short deadline"). The cable—with the newly declassified sentences—is attached to this order.

Accordingly, it is this 20th day of February, 2001,

**ORDERED** that the plaintiff's motion for reconsideration of Magistrate Judge Kay's order regarding the motion to compel production of the State Department cable be **GRANTED** with respect to the above-quoted sentences.

**SO ORDERED.**