**CENTURY INTERNATIONAL ARMS, LTD., and Century International Arms, Inc., Plaintiffs,**

v.

**The FEDERAL STATE UNITARY ENTERPRISE STATE CORPORATION 'ROSVOOROUZHENIE', f/k/a the State Corporation for Export and Import of Armaments and Military Equipment 'Rosvoorouzhenie', Defendant.**

**Civ. A. No. 00–2098(ESH).**

United States District Court, District of Columbia.

Oct. 22, 2001.

James J. Kutz, Eckert, Seamans, Cherin & Mellott, Harrisburg, PA, David J. But-ler, Swidler, Berlin, Shereff & Friedman, L.L.P., Washington, DC, Steve I. Silverman, Kluger, Peretz, Kaplan & Berlin, Miami, FL, for plaintiffs.

David K. Monroe, Timothy Brown, Galland, Kharasch, Greenbert, Fellman & Swirsky, P.C., Washington, DC, Timothy R. Brown, Brown, Parker & Leahy, Houston, TX, Robert Paddock, Thompson, Knight, Brown, Parker and Leahy, Houston, TX, for defendant.

### MEMORANDUM OPINION

HUVELLE, District Judge.

Plaintiffs Century International Arms, Ltd. ("Century Canada") and Century International Arms, Inc. ("Century USA") (collectively, "Century") have sued defendant Federal State Unitary ("Rosvoorouzhenie") under a variety of theories relating to an alleged contract between Century Canada and defendant. Plaintiffs assert that in July and August 1993, Century Canada and Rosvoorouzhenie's predecessor, Oboronexport ("Oboron"), exchanged telexes that amounted to a contract whereby Century Canada would be the sole and exclusive purchaser of Russian SKS carbine rifles for distribution in the United States and Canada. Contending that defendant breached this exclusivity agreement by selling SKS carbines to KBI, Inc., a competitor of Century, plaintiffs seek damages based on breach of contract, promissory estoppel, fraudulent inducement, and fraud.

Before the Court are defendant's motion for summary judgment, as well as defendant's motion to apply Russian law. Plaintiffs oppose summary judgment and argue that either Canadian or District of Columbia law is applicable. Based on the pleadings and the record before it, the Court concludes that irrespective of which law applies, no legally enforceable exclusivity

contract existed between the parties, and second, that plaintiffs' remaining claims are barred by the doctrine of res judicata. In addition, the Court affirms the arbitration award to defendant against Century Canada. Defendant's motion for summary judgment is therefore granted as to plaintiffs' complaint, and partial summary judgment is entered on defendant's counterclaim against Century Canada, but not against Century USA.

## BACKGROUND

### I. Factual Background

Century Canada is a Quebec corporation with its principal place of business in Montreal, Canada. Century USA is a Vermont corporation with its principal place of business in Florida. Both companies are licensed to engage in the purchase, importation and sale of arms and munitions, and sell predominantly in the United States. Defendant Rosvoorouzhenie is an agency or instrumentality of the Russian Federation, and is engaged in the export and import of arms and military equipment.

On January 25, 1993, Century Canada and Oboronexport ("Oboron"), a predecessor to Rosvoorouzhenie, entered into a contract (the "First Contract") for the sale of 100,000 SKS carbines to Century Canada. (Complaint ¶ 11.) On May 27, 1993, Century Canada and Oboron entered into another contract (the "Second Contract", or collectively, the "SKS Contracts") for additional sales of ammunitions. (Complaint ¶ 12.) The Second Contract was modified by several additional agreements executed by the parties in 1994. (Complaint ¶¶ 13–16.)

In July and August 1993, plaintiffs allege that Century and Oboron "consummated an additional written contract whereby Rosvoorouzhenie covenanted and agreed with Century Canada that Century Canada would be the sole and exclusive purchaser of Russian SKS carbines for distribution in the United States and Canada" (the "Third Contract"). (Complaint ¶ 21.) Plaintiffs allege that three letters comprise this Third Contract. The first letter, dated July 21, 1993, is written on Oboron letterhead and responds to a July 14 fax from Century.[1] In paragraph 4 of that earlier fax, Century had asked Oboron, "What are our possibilities to sign sole exclusivity agreement on the SKS + other items?" (Def.Ex. 17, ¶ 4.) In paragraph 4 of the July 21 letter, Oboron replies, "We inform you once more that V/O 'Oboronexport' can not sign such kinds of agreement, because this is the competence of the Government." (Def.Ex. 16, ¶ 4.) The July 14 fax also expresses some surprise that Century has "recently seen advertising in the U.S.A. for Russian SKS rifle from another dealer." (Def.Ex. 17, ¶ 3.) In its July 21 response, Oboron notes, "Unfortunately, we have the information that our competitors have held negotiations concerning delivery of SKS with one of the American firms and, moreover, on more profitable terms for Russia. However, we are doing our best not to carry out these deliveries." (Def.Ex. 16, ¶ 3.) Plaintiffs argue that the July 14 fax was their initial offer of an exclusivity agreement, and that the July 21 letter constitutes a rejection of that offer

1. The text of the July 21 letter actually refers to the initial fax as dated July 19. However, neither party has any record of a July 19 fax, and the July 21 letter lists the reference number of the preceding fax as 0744/93, which matches the reference number on the July 14 fax. In addition, the July 21 letter responds, by numbered paragraph, to the questions posed in the July 14 fax. It is therefore clear that the "July 19" reference in the text of the July 21 letter is a typographical error, and that the latter letter refers to the fax dated July 14.

because "this is the competence of the Government." (Def.Ex. 16.)

The next letter that plaintiffs contend constitutes the Third Contract is dated July 22, 1993, and was sent by Century to Oboron. That letter references the July 21 letter.

> You advised our competitors have held negotiations with another American firm concerning SKS rifles. When we were together, I was left with the impression we bought all SKS rifles available. It is very important that you advise what quantity of SKS rifles, if any, have been delivered to another firm. We need to know name of firm + price. It would be in our best interest if this can be stopped.

(Def.Ex. 18, ¶ 5.) Plaintiffs assert that this paragraph constitutes a renewal of their exclusivity offer. In response, defendant argues the letter does not establish an offer by Century. Rosvoorouzhenie cites to several ambiguities in this letter—including Paragraph 5–A, which asks, "Was our contract approved by the Russian government in its entirety?"—in support of its contention.

The final letter in the series is dated August 11, 1993, and is addressed from Oboron to Century. Paragraph 5 of the letter responds to the above excerpt. "We are ready to inform you that our Government has approved the business cooperation only with your firm. We have no information about other decisions." (Def. Ex. 19, ¶ 5.) Plaintiffs contend that this statement constitutes an acceptance by Oboron of Century's exclusivity offer, and that such a contract was therefore formed by this exchange of letters. Defendant disagrees, arguing that this language is legally insufficient to form a contract, or in the alternative, any such contract is unenforceable under Russian law.

Based on this August 11 letter, plaintiffs argue that defendant breached an exclusivity contract as a result of the sale of arms by another Russian entity, Spetsvneshteknia ("Spets"). In particular, in late 1993 or early 1994, defendant was formed as the successor to Oboron, Spets and a third company, G.U.S.K. (Def. Statement of Facts ¶ 6; Pl. Response ¶ 6.) Even after the formation, however, Oboron and Spets may have continued to operate as separate entities for approximately 18 months, until the acquisition and combination of the companies could occur pursuant to Russian Law. (Id.) Prior to the formation of Rosvoorouzhenie, Spets had entered into a contract for the sale of SKS rifles with KBI, Inc., a competitor of Century. (Def. Statement of Facts ¶ 22.) Like Oboron, Spets was a licensed exporter of arms and military equipment. Spets and KBI performed under their contract from May 1994 to December 1994. Plaintiffs allege that this performance by Spets constitutes a breach of the Third Contract, and on this basis, plaintiffs seek compensatory, special, and consequential damages, including lost profits, punitive damages, interest, and court costs.

## II. Procedural History

Not surprisingly, this suit does not exist in a vacuum. It followed closely on the heels of an arbitration that arose from plaintiff Century Canada's failure to make full payments in 1995 for goods delivered under the Second Contract. Pursuant to a binding arbitration clause,[2] Rosvoorouzhe-

---

2. Under the Second Contract, "All disagreements, disputes or claims, arising out of or relating to this Contract shall be referred to, settled and finally resolved by the Arbitration Institute of the International Chamber of Commerce in accordance with the Rules for Reconciliation and Arbitration. . . . The place of the arbitration shall be Zurich, Switzer-

nie initiated arbitration proceedings on May 30, 1996, before the International Court of Arbitration in Zurich, Switzerland (the "Tribunal"), claiming damages as a result of Century Canada's failure to make full payment for the goods. (Def. Ex. 41, *Rosvoorouzhenie v. Century Int'l Arms, Ltd.*, Case No. 9117/V/AMW, ¶ 7 (Int'l Comm. Arb.1998) [hereinafter *Rosvoorouzhenie* ]). Century Canada filed a counterclaim for losses suffered resulting from the delivery of "non-conforming goods." In support of this claim, Century Canada alleged, *inter alia,* that it and Rosvoorouzhenie had an exclusive contract for the import of SKS carbines and that Century Canada had entered into contracts with Rosvoorouzhenie only because it saw an opportunity to become the sole importer and seller of this product. *Id.* ¶¶ 52–54. Century contended that "during the course of negotiations of [the First Contract and the Second Contract, Rosvoorouzhenie] continually represented to [it] (i) that [Rosvoorouzhenie] was controlling all exports of Russian SKS carbines and (ii) that [Century] would be the sole United States and Canadian importer and purchaser of such carbines." *Id.* ¶ 54. Accordingly, Century argued that those representations of exclusivity became part of the Second Contract. *Id.*

Century contended that these representations were made both orally and in writing as early as 1993 and continued thereafter. First, it argued that Rosvoorouzhenie "orally represented ... the right of exclusivity from the beginning of their negotiations, and inspired in [Century] the understanding that it would control all exports from the Russian Federation of surplus SKS carbines to other countries, in partic-

ular the United States." *Id.* ¶ 80. Next, Century asserted that

it decided to enter into the Contracts only because it saw an opportunity to become the sole importer and seller of surplus Russian SKS carbines in the United States and it was on such assumption that [Century] had been confident to make a profitable business out of it. In dealing with [Rosvoorouzhenie], [Century] therefore always stressed the importance to be the only distributor in North America for unused surplus Russian SKS carbines. [Century] supports its allegation, *inter alia,* by submitting a letter from [Rosvoorouzhenie] dated 6 April 1994 which provides "that at present our firm is delivering this equipment only to you."

*Id.* ¶ 55 (emphasis omitted). Century also "referred to a number of letters addressed to [Rosvoorouzhenie] and to several replies received from [Rosvoorouzhenie]" to support its allegation that "the right of exclusivity was ... subsequently confirmed in writing." *Id.* ¶ 81 (internal citations omitted).

In response, Rosvoorouzhenie denied "that it ever made any representation of exclusivity towards [Century]. Moreover, [Rosvoorouzhenie] points out that Mr. Sucher, Chief Executive Officer of [Century], had specific knowledge that [Rosvoorouzhenie's] predecessor Oboron did not have a monopoly and was not in a position to control the arms market." *Id.* ¶ 56. Rosvoorouzhenie also submitted the statement of a witness who denied any oral representations of exclusivity and stated that for Rosvoorouzhenie to grant such a right would violate Russian law. *Id.* Finally, Rosvoorouzhenie argued that the Second Contract contained a written modifica-

land. The decision of the arbitral tribunal shall be conclusive and binding on each of the

parties." (Def.Ex. 13, ¶¶ 8.2–8.3.)

tion clause and an integration clause, which showed the parties' specific intent to preclude any future oral alterations or amendments, and to supersede all prior negotiations or agreements. *Id.* ¶ 57.

Faced with these arguments, the Tribunal first decided that the substantive law of Russia should apply to the action, based on the "center of gravity" test.[3] Under that standard, the "preponderant connecting factor" determines which jurisdiction's law will govern, and in the case of a sales contract, the domicile of the seller—in this case, Russia—was considered to be determinative. *Id.* ¶¶ 48–49.

Next, the Tribunal determined that there were two issues:

Did the Parties contract for an exclusive right for [Century] to import Russian SKS carbines in the United States? And: did [Rosvoorouzhenie] or its predecessor represent that it would control all Russian exports of carbines to the U.S. market in the sense that it would see to it that no other Russian firm would effectuate supplies to a U.S. importer other than [Century]?

*Id.* ¶ 77. The Tribunal therefore examined two facets of the alleged exclusivity agreement: "First, regarding the aspect that the Russian supplier . . . had represented to be able to control all Russian exports of surplus carbines to the U.S. market . . . and second, that its Russian supplier . . . will not, itself, sell such carbines to any other Canadian or U.S. firm, except [Century]." *Id.* ¶ 82.

The Tribunal then ruled on these issues. "Looking at the wording of [the First and Second Contracts], nothing therein supports [Century's] position that the Parties had contracted for an exclusive right to market the Russian SKS carbines in the United States." *Id.* ¶ 79. Next, the Tri-

bunal found that the Second Contract contained clauses that made it impossible for Century Canada to rely on oral representations and fax correspondence to support an argument that the contracts had been amended or supplemented. *Id.* ¶ 93. The contract contained a merger clause (Def.Ex. 13, ¶ 9.5), the purpose of which was to ensure "that only the terms as reflected in the signed agreement [would] form part of the contractual obligations, thus excluding any extrinsic understandings, oral explanations, assurances, or representations during prior negotiations which are not as such reflected in the written contract." *Rosvoorouzhenie*, at ¶ 86. And the contract had a written modification clause (Def.Ex. 13, ¶ 9.3), which had "the same effects as the merger clause with regard to any future negotiations, promises, and any other extrinsic evidence which might otherwise be adduced for supplementing, altering, or contradicting the written contract." *Rosvoorouzhenie*, at ¶ 89. All modifications to the preexisting contracts were therefore required to be signed and in writing. *Id.* ¶ 91.

The Tribunal held:

The combination of the two discussed clauses, i.e. the merger clause reflected in Article 9.5 of the Contract and the written modification clause as per Article 9.3 of the Contract, make it impossible that, in the instant case, [Century] could rely on any kind of verbal promises or assurances, or any kind of written references which are not at the same time also reflected in an Amendment or Supplement to the Contract.

The evidentiary proceedings conducted in the present case have corroborated the above analysis, leading to the clear conclusion that a legally binding exclusivity had not been promised by [Ros-

3. Neither the First Contract nor the Second Contract contained a choice-of-law provision.

voorouzhenie] or its predecessor Oboro-nexport.

*Id.* ¶¶ 93–94. The Tribunal noted that Century's key witnesses confirmed that Rosvoorouzhenie "refused to reflect any exclusivity in the written contract," and that Rosvoorouzhenie's witnesses told Century "that the granting of any exclusivity was unlawful and against clear regulations, such that no one had the authority to promise any such exclusivity." *Id.* ¶ 95. And even where there was disagreement about Rosvoorouzhenie's oral representations to Century, the Tribunal found that a sophisticated party such as Century could not "reasonably rely on some oral promises or assurances made at dinners or in the framework of discussions of a more private character." *Id.* ¶ 97. In sum, the Tribunal found that any oral representations of exclusivity by Rosvoorouzhenie "have not grown up to the level of a legally or contractually relevant or binding commitment." *Id.* ¶ 100.

The Tribunal also examined

"whether [Century] could rely on some correspondence exchanged between the Parties in which the matter of exclusivity had been addressed by them. The Tribunal, in particular, has noted that [Century] had addressed several letters to [Rosvoorouzhenie] in which it strongly emphasized the crucial nature and necessity of exclusivity. In addition, [Century] has submitted various letters emanating from [Rosvoorouzhenie] which, in its view collaborate that [Ros-

voorouzhenie] in fact had agreed to such exclusivity."

*Id.* ¶ 101. The Tribunal found that none of these letters—before or after the Second Contract—could be found to "clearly spell[ ] out the granting of an exclusive right." *Id.* ¶ 102.[4] Because of the significance of exclusivity to both parties, the Tribunal observed that "one would normally have expected the Parties to settle some further terms such as provisions regarding minimum quantities to be taken during specified periods of time, the duration of the Contract, conditions for granting or maintaining the exclusivity, and provisions for terminating the Contract." *Id.* ¶ 103. Given the absence of these essential terms, the Tribunal found for Rosvoorouzhenie, awarding $2.4 million with interest accruing at 15% per annum from May 27, 1995, attorney's fees of $48,000, and $87,500 in arbitration costs, and dismissed Century Canada's counterclaims. *Id.* ¶ 103; pp. 62–63, ¶¶ 1–7.

Century Canada appealed to the Swiss Federal Court, alleging that the Tribunal had failed to take into account a fax dated February 3, 1995.[5] In a decision dated September 22, 1998, the Swiss Federal Court held that the Tribunal had considered all evidence presented, including the disputed fax, and concluded that the contractual relationship was not exclusive. Century Canada also claimed that the Tribunal had overstepped its jurisdiction by denying further claims, requests, and motions.[6] The Swiss Federal Court held that

---

4. While it is unclear whether these letters included the July and August 1993 correspondence that plaintiffs rely on here, it is clear that plaintiffs' argument that the parties' course of conduct supports a holding of exclusivity (*see* Pl. Opp. at 6–7) is constructed from many of the same letters that were submitted to the Tribunal. (*See, e.g.,* Def. Exs. 21 (Letter of Sept. 2, 1993), 23 (Letter of Dec. 2, 1993) 29 (Letter of June 15, 1994).)

5. In this fax to Century, Rosvoorouzhenie explains that it "could not control at all deliveries of [SKS carbines] by other Russian firms." (Def.Ex. 40.)

6. In particular, Century argued that the Tribunal should not have dismissed its claim for reimbursement of a $1.13 million penalty that it had previously been assessed by the Moscow Customs Administration for failure to pay

the Tribunal did not overstep its jurisdiction because its judgment addressed only the issue of whether the First and Second Contracts were exclusive, and it did not make a determination about any possible subsequent contracts. Therefore, the appellate court upheld the arbitration award.

After the arbitration award was entered and the appeal was denied, defendant instituted an action in Montreal for confirmation of the award. Nonetheless, Century Canada has refused to pay the award, but instead, it instituted suit in federal court in the Middle District of Pennsylvania alleging that the correspondence between it and Oboron in July and August 1993 constituted a Third Contract that Rosvoorouzhenie breached when Spets sold arms to Century's competitor. The current iteration of plaintiffs' complaint alleges six claims for relief. In their Second Amended Complaint, filed on April 11, 2001, Century Canada and Century USA allege that defendant breached the Third Contract, which allegedly granted exclusivity to Century Canada, when Spets sold arms to KBI in 1994. In addition, plaintiffs have brought promissory estoppel claims, alleging that defendant made representations regarding Century Canada's exclusive rights, which plaintiffs detrimentally relied on when they entered into several Additional Agreements (and Annexes thereto) to the Second Contract. Next, Century Canada claims that it was fraudulently induced by Rosvoorouzhenie into entering into these Additional Agreements by a series of material misrepresentations (including those in the telexes alleged to comprise the Third Contract) made by Oboron officials in 1993 and 1994 concerning their willingness to deal exclusively with plaintiffs. Finally, Century USA has brought a claim for fraud against Rosvoorouzhenie under a similar theory.[7]

In response, Rosvoorouzhenie filed a counterclaim for enforcement of the judgment of the Arbitration Tribunal and a motion to dismiss on the grounds of res judicata or collateral estoppel—based on the ruling of the Tribunal—or, in the alternative, to transfer on *forum non conveniens* grounds. On August 28, 2000, the Pennsylvania federal district court concluded that venue was improper there, and the case was transferred to the District of Columbia pursuant to 28 U.S.C. § 1406(a). Under the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1602, *et seq.,* venue is proper in this District because "the action is brought against a foreign state or political subdivision thereof."[8] 28 U.S.C. § 1391(f)(4).

On October 18, 2000, this Court ruled that plaintiffs' suit was not barred by res judicata or collateral estoppel, because the issue of whether the correspondence of the summer of 1993 resulted in a third contract had not been adjudicated by the Tribunal. The Court held, "Century Canada's claim that Rosvoorouzhenie breached a Third Contract cannot be precluded on

foreign currency proceeds. *Rosvoorouzhenie,* at ¶ 8.

**7.** Century USA bases its claim as a plaintiff on the theory that it was a third-party beneficiary of the dealings between the defendant and Century Canada. In effect, it argues that Century Canada provided arms to Century USA for resale in the United States and elsewhere, and that Rosvoorouzhenie knew of these dealings, and understood that Century USA would be the ultimate recipient of the

SKS carbines that the Russian company sold to Century Canada. (*E.g.,* Complaint ¶ 64–65.)

**8.** Defendant qualifies under the statute as a "foreign state or political subdivision thereof," 28 U.S.C. § 1391(f)(4), because "[a] 'foreign state' ... includes ... an agency or instrumentality of a foreign state," 28 U.S.C. § 1603(a), and it is undisputed that Rosvoorouzhenie is an agency or instrumentality of Russia.

[res judicata] grounds, because the Tribunal did not have jurisdiction over this claim. The Tribunal's dismissal of Century Canada's claims extended only to those claims raised in the arbitration proceedings and could not extend to further agreements between the parties." (Memorandum Op. at 7.)

After this ruling, the parties engaged in discovery, and upon its completion, defendant moved for summary judgment on June 22, 2001, on eight different grounds. First, it contends that a Third Contract was never entered into by the parties, or in the alternative, any such contract is unenforceable under Russian law. Second, it asserts that plaintiffs' contract and fraud claims are barred by the statute of limitations. Third, it argues that the Third Contract is unenforceable because it violates Section 3 of the Clayton Act, 15 U.S.C. § 14. Fourth, it submits that Rosvoorouzhenie is not obligated as the successor to Oboron under any Third Contract. Fifth, it contends that Rosvoorouzhenie did not breach the contract when Spets sold arms to KBI, because Spets and Oboron were separate legal entities at that time. Sixth, it argues that Century USA cannot enforce any Third Contract because is not a valid third-party beneficiary under Russian law. Seventh, it invokes the doctrine of res judicata to argue that plaintiffs' claims relating to the amendments to the Second Contract are barred. Eighth, it alleges that plaintiffs have no evidence of fraud under Russian law. Rosvoorouzhenie also seeks summary judgment on its counterclaim to enforce the arbitration award against both Century Canada and Century USA.[9]

9. While defendant raises many meritorious grounds for dismissal, the Court has limited its discussion to whether plaintiffs can prove a legally enforceable contract, and second,

## LEGAL ANALYSIS

### I. Standard of Review

Under Fed.R.Civ.P. 56, a motion for summary judgment shall be granted if the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits show that there is no genuine issue of material fact, and that the moving party is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In considering a motion for summary judgment, the "evidence of the non-movant is to be believed, and all justifiable inferences are to. be drawn in his favor." *Id.* at 255, 106 S.Ct. 2505; *see also Washington Post Co. v. United States Dep't of Health and Human Servs.*, 865 F.2d 320, 325 (D.C.Cir.1989). In a matter involving a contract, summary judgment is appropriate where the agreement "admits of only one reasonable interpretation." *United Mine Workers of America 1974 Pension v. Pittston Co.*, 984 F.2d 469, 473 (D.C.Cir. 1993).

The non-moving party's opposition must consist of more than mere unsupported allegations or denials and must be supported by affidavits or other competent evidence setting forth specific facts showing that there is a genuine issue for trial. Fed.R.Civ.P. 56(e); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The non-moving party must provide evidence that would permit a reasonable jury to find in the non-moving party's favor. *Laningham v. United States Navy*, 813 F.2d 1236, 1241 (D.C.Cir.1987). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."

whether plaintiffs' remaining fraud and promissory estoppel claims are barred by principles of res judicata.

*Liberty Lobby,* 477 U.S. at 249–50, 106 S.Ct. 2505 (citations omitted).

## II. Choice of Law

Before proceeding to the merits of defendant's motion, the Court must decide which jurisdiction's substantive law applies in this case.[10] Before it can make this determination, the Court must identify which jurisdiction's choice of law rules apply.

### A. Choice–of–Law Rules

■ The FSIA "requires courts to utilize the choice-of-law analysis of the forum state with respect to all issues governed by state substantive law." *Virtual Defense and Development International, Inc. v. Republic of Moldova,* 133 F.Supp.2d 9, 15 (D.D.C.2001) (noting that "[t]he goal of applying identical substantive laws to foreign states and private individuals cannot be achieved ... unless a federal court utilizes the same choice-of-law analysis in FSIA cases as it would if all the parties to the action were private"). Therefore, the choice-of-law rules of the District of Columbia apply to this action.

Even under D.C. law, however, the parties dispute which set of choice-of-law rules should govern this case. Defendant argues that this Circuit uses "a constructive blending of the governmental [interest] analysis and the most significant relationship test to determine the choice of law." (Def. Reply at 2 (citing *Virtual Defense,* 133 F.Supp.2d at 15).) Plaintiffs contend that the proper test is the government interest analysis.

■ Under either standard, a court must first determine whether there is a conflict between the laws of the relevant

jurisdictions. *Eli Lilly and Co. v. Home Insur. Co.,* 764 F.2d 876, 882 (D.C.Cir. 1985). If a conflict exists, under the governmental interest analysis, the court must apply the law of the jurisdiction which has a more substantial interest in the case. *Id.* In other words, the court must "determine which jurisdiction's policy would be most advanced by having its law applied to the facts of the case under review." *Felch v. Air Florida, Inc.,* 866 F.2d 1521, 1523 (D.C.Cir.1989). "If the interest of the two jurisdictions in the application of their law are equally weighty, the law of the forum will be applied." *Williams v. First Gov't Mortgage and Investors Corp.,* 176 F.3d 497, 499 (D.C.Cir.1999).

In cases involving the interpretation of a contract, however, this Circuit has looked to the significant relationship test, which comes directly from the Restatement (Second) of Conflict of Laws § 188. Under that standard,

> In the absence of an effective choice of law clause by the parties [ ], the contacts to be taken into account in applying the principles ... to determine the law applicable to an issue include: (a) the place of contracting, (b) the place of negotiation of the contract, (c) the place of performance, (d) the location of the subject matter of the contract, and (e) the domicile, residence, nationality, place of incorporation and place of business of the parties.

*Id.* § 188(2). However, this test has been used primarily in connection with cases involving the interpretation of existing contracts. *See, e.g., Stephen A. Goldberg Co. v. Remsen Partners, Ltd.,* 170 F.3d 191, 194 (D.C.Cir.1999); *Ideal Electronic Sec. Co. v. International Fidelity Ins. Co.,* 129

---

**10.** As noted, neither the First Contract nor the Second Contract contains a choice-of-law provision.

F.3d 143, 148 (D.C.Cir.1997).[11] This case, in contrast, focuses on the question of whether a contract exists at all—not how an existing contract should be interpreted. It is therefore appropriate for this Court to follow the government interest analysis, which addresses the competing interests of the jurisdictions, rather than the significant factor test, which focuses on facts relating to the parties, their negotiations, and the performance of the contract.

### B. False Conflict

■ Defendant contends that Russian law applies to this action; plaintiffs argue in support of either Canadian or District of Columbia law. No matter which law applies, however, the result would be the same. Each jurisdiction follows hornbook contract law to determine if a contract exists where there is no formal written agreement: there must be a meeting of the minds as to the essential terms, and in the absence of such an agreement, there can be no contract. Applying this analysis to the correspondence and the undisputed facts in this case, there is no basis upon which to infer an exclusivity contract between the parties.

### 1. Russian Law

Under Russian law, a contract is deemed to be formed at the time when the person who made an offer receives a complete and unconditional acceptance. *See* Fundamentals of the Civil Litigation of the USSR and Republics of May 31, 1991 art. 58, §§ 3–7 (effective Aug. 3, 1992) [hereinafter "Fundamentals"]. (Def. Ex. 59, Affidavit of Ilya Nikiforov ("Nikiforov Aff."), at 6.)[12] An offer is deemed sufficiently specific if it sets forth all the essential terms of a contract or at least references how the essential terms shall be ascertained by the offeree. *Id.* Acceptance is the reply of the offeree expressing consent to accept the offer and enter into the contract. *Id.* The essential terms of a contract are those that "are deemed as such by legislation or are necessary to the given type of contract, and all other points on which, according to the declaration of either party, agreement should be reached." Fundamentals, art. 58, § 1.

Russian legislation provides for many traditional "named" contracts, such as the sale or lease of goods. For these named contracts, the legislation defines the subject matter and essential terms. (Nikiforov Aff. at 8.) Exclusivity contracts, however, are not identified under Russian legislation. Therefore, the parties to an exclusivity contract must agree on the subject matter of the agreement and the

---

**11.** In *Virtual Defense,* the Court applied the significant relationship test as a precursor to determining that an enforceable contract did not exist between the parties. However, the facts in *Virtual Defense* were far more amenable to the application of the significant relationship test than is the case here. There, for example, the parties negotiated face-to-face, and the subject matter and purpose of the alleged contract were clear. *Virtual Defense,* 133 F.Supp.2d at 16. Here, in contrast, the significant relationship test would have limited utility. Because the alleged contract consists of four faxes, the first two factors—the places of contracting and negotiation—are meaningless. Similarly, the place of performance of the alleged agreement is not speci-

fied. Thus, the significant relationship test would be reduced to the final two factors—the location of the subject matter of the contract, and the domicile, residence, nationality, place of incorporation, and place of business of the parties. Even if this were sufficient information on which to determine choice of law, the balance would still tilt toward Russia (the location of the SKS rifles), and the Court would therefore reach the same result that it does under the government interest analysis.

**12.** Under Russian law, a transaction is governed by the law in effect at the time the transaction occurred, and therefore the Fundamentals apply. (Nikiforov Aff. at 5.)

essential terms necessary for such a contract. (*Id.*) For an exclusivity contract, these essential terms include, at a minimum, the nature of the undertaking, the goods covered by the contract, and the scope of the exclusivity. (*Id.* at 8–9.) By definition, the nature of an exclusivity contract is to refrain from performance; however, Russian law does not enforce contracts of forbearance—in which one party agrees to refrain from doing something to which they are legally entitled—unless the forbearance is supplemental to an obligation under the same contract to carry out an active function. (*Id.* at 7.) [13]

For a variety of reasons, Russian law does not recognize the alleged exclusivity contract in this case. First, the letters that plaintiffs allege comprise an exclusivity contract fail to specify the scope of that exclusivity. In the July 14 letter, Century asks what the possibilities are "to sign sole exclusivity agreement on the SKS + other items." (Def.Ex. 17.) Oboron responds that it can not sign these kinds of agreements. (Def.Ex. 16.) Plaintiffs then write to defendant that "it would be in our best interest if [the sale of SKS rifles to other American firms] can be stopped." (Def.Ex. 18.) Oboron replies that it "is ready to inform you that our Government has approved business cooperation only with your firm; we have no information about other decisions." (Def.Ex. 19.) Century's statements do not qualify as an offer, because they fail to provide any definition of the scope of the exclusivity, which is one of the essential terms of the contract. The offers do not specify the length of the exclusivity or the geographical scope of the contract. Nor do they identify the subject matter of the alleged contract— "the SKS + other items"—with reasonable specificity. Consequently, they are not offers from which a legally enforceable contract could result.[14] Moreover, because these essential terms are missing, any resulting exclusivity contract would restrict the legal ability of Oboron to enter into any sales contract, in violation of the Fundamentals. *See* Fundamentals, art. 12, § 2 ("A legal person may be restricted in its rights only in cases and in the manner stipulated by legislative acts.") Finally, the alleged exclusivity contract is unenforceable under Russian law because its sole purpose is forbearance. The contract would do nothing other than prevent Oboron from selling to other American firms; Oboron would not be required to act affirmatively under the alleged contract. For all of these reasons, there is no enforceable exclusivity contract under Russian law.

### 2. Quebec Law

An analysis of the facts under Canadian law is made unnecessarily difficult by plaintiffs' failure to inform the Court about the law of that country. While plaintiffs suggest that Canadian law recognizes exclusivity agreements as well contracts formed solely by a series of letters, these superficial observations do little to advance plaintiffs' positions.

Century contends that Canadian law should apply to this matter. In fact, the proper Canadian jurisdiction to examine is Quebec, which is the domicile of Century Canada. As in the United States, substan-

---

13. Plaintiffs do not contest any of these substantive provisions of Russian law.

14. The Tribunal reached a similar conclusion. "If exclusivity had indeed been contemplated by both Parties, then one would normally have expected the Parties to settle some further terms such as provisions regarding minimum quantities to be taken during specified periods of time, the duration of the Contract, conditions for granting or maintaining the exclusivity, and provisions for terminating the Contract." *Rosvoorouzhenie,* at ¶ 103.

tive contract law in Canada is not federalized; instead, there is provincial contract law. To make matters more complicated, Quebec is the lone Canadian province that follows a civil code, rather than the common law. *See* Gerald L. Gall, *The Canadian Legal System* 22–31 (3d ed.1990). Like the District of Columbia, however, Quebec does require that a contract contain certain essential terms. *See V.K. Mason Construction, Ltd. v. Bank of Nova Scotia,* [1985] 1 S.C.R. 271. The analysis of the alleged contract under District of Columbia law therefore applies with equal force to Quebec law, under which the alleged agreement is also unenforceable.

### 3. District of Columbia Law

Under the governmental interest analysis, if the interests of Canada and Russia "are equally weighty, the law of the forum will be applied." *Williams,* 176 F.3d at 500. But the result would be the same as it is under Russian or Quebec law.

■ Under District law, "[a] contract must be sufficiently definite as to its material terms (which include, *e.g.,* subject matter, price, payment terms, quantity, quality, and duration) that the promises and performance to be rendered by each party are reasonably certain. That test is met when the contract provides a sufficient basis for determining whether a breach has occurred and for identifying an appropriate remedy." *Rosenthal v. National Produce Co.,* 573 A.2d 365, 370 (D.C.1990). *See Virtual Defense,* 133 F.Supp.2d at 17 ("For an enforceable contract to exist under D.C. law, there must be agreement as to all material terms and an intention of the parties to be bound.") The party asserting the existence of a contract bears the burden of proof in that regard. *Id.; Jack Baker, Inc. v. Office Space Development Corp.,* 664 A.2d 1236, 1238 (D.C. 1995).

Courts in this District have consistently "found agreements to be unenforceable because the parties failed to agree to all material terms." *Jack Baker, Inc.,* 664 A.2d at 1239. In *Stansel v. American Security Bank,* 547 A.2d 990 (D.C.1988), the D.C. Court of Appeals held a contract was unenforceable because the parties had failed to "offer[ ] evidence of any specific terms of the alleged agreement, such as the exact amount of the loans, the interest rates, terms of payment, or manner of performance." *Id.* at 993. In *Virtual Defense,* the court found that a contract did not exist where the parties had not discussed "the method or timing of payment . . . the number and cost of [the goods] to be sold, or the manner of performance, or the precise role of the plaintiff." *Virtual Defense,* 133 F.Supp.2d at 18–19. In *Edmund J. Flynn Co. v. LaVay,* 431 A.2d 543 (D.C.1981), the court found no enforceable sales commission contract "because there was never any agreement on the material terms of compensation and termination." *Id.* at 547. And in *Rosenthal,* the court held that an alleged contract between a produce supplier and a restaurant was unenforceable because "there was no stated agreement as to price, quantity, quality, or duration." *Rosenthal,* 573 A.2d at 370.

Similarly, plaintiffs in this case have failed to demonstrate the existence of an enforceable contract. As noted above, several material terms are missing from the alleged agreement: the correspondence does not adequately specify the subject matter of the contract, it fails to specify the number of goods to be exclusively sold to Century, and it does not indicate the duration or geographical scope of the exclusivity.

In response, plaintiffs appear to argue that the course of conduct by the parties subsequent to the July and August 1993 letters is evidence of an exclusivity con-

tract. "Contract law has long recognized that parties to a contract may vary its terms by a subsequent course of conduct." *Sam Rayburn Dam Electric Cooperative v. Federal Power Commission,* 515 F.2d 998, 1009 (D.C.Cir.1975). In *Capital View Realty Co. v. Meigs,* 92 A.2d 765 (D.C. 1952), for example, the court found that even where a residential lease prohibited keeping a dog in an apartment, extended inaction by the landlord in circumstances implying his knowledge constituted a waiver of his ability to enforce the no-pets provision. *Id.* at 765–66.

In this case, however, neither party's conduct supports an inference as to an exclusivity agreement. During the weeks and months after the summer of 1993, in letter after letter, Century continued to inquire into the sale of arms by Oboron and Rosvoorouzhenie to Century's competitors in North America, and to request that such transactions cease. (*See* Def. Ex. 21, Sept. 2, 1993 ("Please advise quantity of SKS rifles that have been sold through your competitive company to our competitors in the States."); Def. Ex. 22, Sept. 20, 1993 ("We would still like to know the quantities of surplus other firms have purchased in particular items which are the same or similar to those we are pur-chasing from you such as the SKS carbine."); Def. Ex. 23, Dec. 2, 1993 ("Will you be able to set up a meeting with the responsible parties who can make decisions to protect Century Arms on any material we are buying. . . . As previously explained to you, it is not fair when we are buying millions of dollars of certain products from you that your authorities allow other companies to also buy these for the North American market."); Def. Ex. 26, Jan. 21, 1994 ("Please confirm that no other firm is being sent SKS rifles from Russia, either from Oboronexport or any other company in Russia."); Def. Ex. 36, Sept. 19, 1994 ("Can you advise what other firms are selling material in the U.S.A., as you confirmed that you are only selling to us.").) None of these letters—nor any contract between plaintiffs and Oboron—contains a reference to an exclusivity contract. (*See* Def. Ex. 51, at 149 (Deposition of Michael Sucher, President of Century).)[15] Moreover, Century's continual pleas for exclusivity belie any claim that such a contract existed.

It is therefore clear that there was no exclusive course of dealings, nor was there an understanding that there was an exclusivity contract.[16] Rather, the course of

---

15. Plaintiffs cite to a single document, dated July 18, 1994, in which Rosvoorouzhenie wrote to Century that "[d]elivery of carbines and other equipment to Canada is carried out by us only through your firm in accordance with our agreement." (Pl.Ex. A.) This sole document is insufficient, even when viewed in the light most favorable to plaintiffs, to support the existence of an exclusivity agreement based on the July and August 1993 letters. The July 1994 fax makes no specific reference to these letters. Its meaning is also ambiguous, since at the time Spets may have been a separate entity and was selling arms only to a U.S. company. Moreover, the fact that "agreement" is not capitalized in the sentence to which plaintiffs point—although Rosvoorouzhenie does repeatedly capitalize "Agreement" and "Contract" later in the text of the same letter when referring to specific contracts—indicates that any exclusivity "agreement" to which Century refers is, at best, an unenforceable "gentleman's agreement," which coincides with at least one key Century employee's perception of this exclusivity deal. (*See* Def. Ex. 49, at 57, 104, 111, 131.)

16. For instance, on January 31, 1995, Joseph Shannis, the Chief Financial Officer of Century wrote to Rosvoorouzhenie, "We have purchased these from you quite some time ago and were always told that we were the only firm to whom you were selling. The reality of the market place is that we are not the only firm you have sold to, as many of the firms to whom we would normally sell these SKS carbines have imported them directly and have no interest in purchasing ours. . . . Our prob-

conduct subsequent to the July and August 1993 letters buttresses the conclusion that as a matter of law, one cannot find that an exclusivity contract existed between the parties. It is thus impossible to conclude that there was a breach of any contract when Spets sold SKS rifles to KBI in 1994, for there was no exclusivity agreement under the law of any of the three relevant jurisdictions. Plaintiffs' claims for breach of contract are therefore dismissed.

## C. Government Interest Analysis

■ Even assuming *arguendo* that there is no false conflict, the Court would apply Russian law to this action. Under the government interest analysis, the Court "must determine which jurisdiction has the more substantial interest." *Eli Lilly and Co.,* 764 F.2d at 882. Most of the traditional factors used to make this determination—the place of the injury, the place where the conduct occurred, the domicile of the parties, the place where the relationship is centered, and the location of the subject matter of the contract—favor neither Russia nor Quebec, because the alleged contract was executed by means of a series of faxes between Russia and Quebec, involving a Russian company and a Quebec company.

Several factors, however, tilt the balance decidedly in favor of Russian law. Defendant is an agency or instrumentality of the Russian government, and the subject matter of the alleged contract is Russian arms. Russia has an extremely strong interest in

ensuring that its state-controlled agencies are not subjected to laws that may contravene its own, so as not to interfere with the Russian government's ability to continue to transact business with North American companies. The Court therefore finds that the government interest analysis favors the application of Russian law. *See Chinnery v. Frank E. Basil, Inc.,* 1988 WL 4803, at *1 (D.D.C. Jan.13, 1988) (action had a substantial relationship to Saudi Arabia where contract could be terminated at behest of the Saudi government, and plaintiff was supervised by members of Saudi Navy).[17]

## III. Russian Law

As noted, the alleged contract is not enforceable under Russian law because it lacks several essential terms. However, even if it could be construed as a contract—which it cannot—it would still contravene Russian law because it was not authorized by a member of the Russian government. According to the Nikiforov Affidavit, under Russian law, "some contracts require not merely 'the meeting of minds' of the parties, but also the public act of the competent authority authorizing the contract." (Nikiforov Aff. at 10.)[18] The Regulations for the Military and Technical Cooperation of the Russian Federation with Other Countries (May 12, 1992) [hereinafter Regulations] "define the procedure for state regulation of the export and import of armaments and military

lem is not a question of exclusive versus non-exclusive importer." (Def.Ex. 39, Jan. 31, 1995.)

17. As previously noted, the International Court of Arbitration also determined that Russian law should be applied in an action based on the First and Second Contracts. Applying the "center of gravity" test, in which the substantive law to be applied in a sales contract case is typically determined by the domi-

cile of the seller, the Tribunal held that "the objective approach clearly leads to the conclusion that the present contractual relationship is most closely related to the seller's legal system, i.e. to the laws of the Russian Federation." *Rosvoorouzhenie* ¶ 49 (emphasis omitted).

18. Plaintiffs do not contest these principles of Russian law.

technology ... with other countries." Regulations § 1. Under the Regulations, the Russian Government is responsible for determining the "time-limits and conditions of delivery abroad of arms and military technology." *Id.* § 2, ¶ 5. The Russian Government must explicitly approve any contract involving the sale of arms to a foreign entity. (Nikiforov Aff. at 11.) According to the Regulations for Licensing the Export and Import of Products (Works, Services) for Military Use in the Territory of the Russian Federation (Jan. 28, 1993), a resolution of the Russian Government or a signed or initialed contract, among other items, is required to obtain a license to export arms. *Id.* § 3, ¶¶ 2, 5. These public acts are therefore essential elements of the contract, without which the contract is unenforceable. (Nikorofov Aff. at 11–12.)

Plaintiffs' only argument that the so-called Third Contract complied with these requirements is that the August 11 fax was written on Oboron stationery and signed by an individual named "Gnylenko," who, plaintiffs argue, is a representative of the Russian Government. This contention is unpersuasive. Plaintiffs offer nothing other than bald assertions to support their argument that he represents the Russian Government. Moreover, the substance of the fax that was signed by Gnylenko—"[w]e are ready to inform you that our Government has approved the business cooperation only with your firm ...."—hardly supports an argument that Gnylenko is a representative of the Russian Government, since the fax speaks of the Government as a separate entity. Most importantly, however, the signature does not comport with the requirements of Russian law because there is nothing in writing that purports to be the signed approval of the Russian Government. The signature and representation of Oboron's Gnylenko is legally insufficient to bind the Government of the Russian Federation under Russian law, and that governmental approval is an essential term of the contract. Any alleged exclusivity contract is therefore unenforceable under Russian Law and will not be enforced by this Court.

## IV. Res Judicata

Having dismissed plaintiffs' breach of contract claims, four claims remain. Both plaintiffs have brought promissory estoppel claims, alleging that defendant made representations regarding Century Canada's exclusive rights, which plaintiffs detrimentally relied on when they entered into several Additional Agreements (and Annexes thereto) to the Second Contract. Century Canada also alleges that it was fraudulently induced by Rosvoorouzhenie into entering into these Additional Agreements by a series of material misrepresentations—including those in the telexes alleged to comprise the Third Contract—concerning exclusivity made by defendant in 1993 and In 1994. Lastly, Century USA has brought a claim for fraud against Rosvoorouzhenie under a similar theory. The Court finds that these claims are barred under the doctrine of res judicata.

A claim is precluded as a result of a previous action if (1) the earlier judgment is final and on the merits; (2) the parties are the same or in privity; and (3) the claims asserted by plaintiffs were relevant to the cause of action in the prior proceeding, whether or not those claims were raised at trial. *See Smith v. Jenkins,* 562 A.2d 610, 613 (D.C.1989); *Stutsman v. Kaiser Foundation Health Plan,* 546 A.2d 367, 369–70 (D.C.1988). The decisions of binding arbitration proceedings are final decisions on the merits for purposes of res judicata. *Schattner v. Girard, Inc.,* 668 F.2d 1366, 1368 (D.C.Cir.1981);

*Witkowski v. Welch*, 173 F.3d 192, 199 (3d Cir.1999). Therefore, only the latter two prongs of the test require further analysis.

▉ First, the Court must determine whether Century USA is in privity with Century Canada for purposes of res judicata. Defendant contends that Century Canada was acting as the agent of Century USA, its principal, with regard to the transactions with Rosvoorouzhenie. Plaintiffs disagree, arguing that "[f]or res judicata purposes, 'agents and principals are not ordinarily in privity with each other.'" *Advantage Health Plan, Inc. v. Knight*, 139 F.Supp.2d 108, 111 (D.D.C.2001) (quoting *Usher v. 1015 N St., N.W. Coop. Ass'n*, 120 A.2d 921, 922 (D.C.1956)). However, "a decision on the merits in an action against the principal is res judicata in a later action against the agent only 'if the prior action concerned a matter within the agency.'" *Id.* (quoting *Major v. Inner City Prop. Mgmt., Inc.*, 653 A.2d 379, 381 (D.C.1995)). The inverse is also true: a decision on the merits against the agent is res judicata against the principal if the prior action concerned a matter within the scope of the agency. *Usher*, 120 A.2d at 923.

The record before the Court regarding the relationship between Century USA and Century Canada is surprisingly sparse. Neither party has clarified the relationship between the two Centuries, and any representations that Century Canada may have made to defendant regarding its connection to Century USA are disputed. Plaintiffs' arguments, however, are undone by the language of their complaint, which is rife with representations that the intent of Century Canada in purchasing arms from Rosvoorouzhenie was to then ship those weapons to Century USA for sale in the United States. This is the basis of each claim for relief brought by Century USA. (*See* Complaint ¶¶ 36–37

(breach of contract claim), 56–57 (promissory estoppel claim), 64–65 (fraud claim).) In order for Century USA to prevail on any of these claims, the Court would first have to find that Century Canada was acting as an agent of Century USA when it purchased arms from Rosvoorouzhenie to pass on to Century USA for resale in the United States. For purposes of res judicata, such a relationship constitutes privity, because Century Canada was acting as an agent of Century USA, and the arbitration proceeding certainly concerned a matter within the scope of the agency. *See, e.g., Rosvoorouzhenie*, at ¶¶ 94–105.

Next, the Court examines whether the claims asserted by plaintiffs are the same as those asserted in the arbitration. In the October 18, 2000 Memorandum Opinion, this Court held that the claim of breach of contract relating to a Third Contract was not barred because the arbitration dealt with the First and Second Contracts, and not with the Third Contract. Since the Tribunal did not address whether such a contract existed, let alone whether defendant breached it, this Court denied defendant's motion to dismiss on the grounds of res judicata. (Memorandum Op. at 7.) However, since the Court issued its October 18, 2000 Memorandum Opinion, plaintiffs have amended their complaint to include claims relating to the Second Contract. Thus, the Court now must determine if these new claims are barred by res judicata.

▉ A claim "includes all rights of the plaintiffs to remedies against the defendant with respect to all or any part of the transaction, or series of connected transactions, out of which the action arose." Restatement (Second) of Judgments § 24(1) (1982). The Second Contract, which was the subject of the Tribunal's ruling, had a mandatory arbitration clause that covered any claim "arising out

of or related to" that Contract. (Def.Ex. 13, ¶ 8.2.) Plaintiffs' promissory estoppel, fraudulent inducement, and fraud claims all allege that Rosvoorouzhenie's representations of exclusivity caused Century Canada to enter into Additional Agreement 1 to the Second Contract in August 1994, Additional Agreement 3 to the Second Contract in October 1994, Annex 1 to Additional Agreement 3 to the Second Contract in October 1994, and Additional Agreement 4 to the Second Contract in October 1994. Under the doctrine of res judicata, as well as the terms of the Second Contract, all of these claims were required to be litigated before the Tribunal.[19] Moreover, they cannot be raised here, since they were in fact litigated before the Tribunal.[20] *Rosvoorouzhenie*, ¶¶ 84–109. Thus, because the earlier judgment is final and on the merits; the parties are the

same or in privity; and the claims asserted by plaintiffs are the same as those asserted in the earlier action, plaintiffs' remaining claims must be dismissed.[21]

## V. Affirmation of Arbitration Award

 Finally, defendant has filed a counterclaim asking this Court to enforce the arbitration award by the Tribunal against plaintiffs. Pursuant to 9 U.S.C. § 203, this Court has the power to enforce international arbitration awards. *Creighton Ltd. v. Qatar*, 181 F.3d 118, 121 (D.C.Cir.1999). Rosvoorouzhenie and Century Canada agreed that the Arbitration would be binding and conclusive, and Century Canada has not sought to modify or vacate the award. Consequently, the Court will enforce the arbitration award against Century Canada in the amount of

19. Plaintiffs' claims for promissory estoppel, fraud, and fraudulent inducement are precluded not only by the doctrine of res judicata, but also by the mandatory arbitration provision in the Second Contract, which required that all disputes arising from or relating to that Contract had to be submitted to arbitration, rather than to a court. (Def. Ex. 13, at ¶ 8.2.)

20. These claims are also precluded on grounds of collateral estoppel, which provides that when an issue of ultimate fact has been determined by a valid and final judgment, that issue cannot be relitigated in any future lawsuit between the same parties. *United States v. Lima*, 424 A.2d 113, 116 (D.C.1980). Collateral estoppel prevents a party from relitigating an issue of fact or law when (1) the issue was actually litigated, and (2) determined by a valid, final judgment on the merits, (3) after a full and fair opportunity for litigation by parties or the privies, (4) under circumstances where the determination was essential to the judgment, not merely dictum. *See Thomas v. Albright*, 77 F.Supp.2d 114, 119 (D.C.1999) (citing *Davis v. Davis*, 663 A.2d 499, 501 (D.C.1995)). In this instance, plaintiffs are collaterally estopped from asserting their promissory estoppel, fraudulent inducement, and fraud claims by the judg-

ment of the Tribunal, which held that Century could not "reasonably rely" on any oral representations of exclusivity that may have been made by defendant, nor could it rely on any written correspondence regarding exclusivity from defendant when it signed the Second Contract and its amendments. *Rosvoorouzhenie*, at ¶¶ 93, 97, 101, 103–05. The Tribunal also held that Century admitted that it had been explicitly informed by Rosvoorouzhenie that exclusivity could not be reflected in the Second Contract or its amendments. *Id.* ¶ 104. Because the judgment of the Tribunal is final, Century Canada and Century USA are in privity, the parties had a full and fair opportunity for litigation on these matters, and the Tribunal's holdings regarding the nature of defendant's representations and whether Century reasonably could rely on any such representations were essential to its overall holding, plaintiffs' promissory estoppel, fraud, and fraudulent inducement claims are also barred on grounds of collateral estoppel.

21. This holding is squarely in line with the Court's October 18, 2000 Opinion, which held only that "Century Canada's claim that Rosvoorouzhenie breached a Third Contract cannot be precluded on [res judicata] grounds." Memorandum Op. at 7.

$2,400,000.00 at an interest rate of 15% per annum accruing from May 27, 1995. In addition, the Court enforces the arbitration award against Century Canada for $48,000 in attorney's fees and costs, and $87,500.00 for the cost of the arbitration. (*Rosvoorouzhenie* at 62–63, ¶¶ 1–7.) [22]

## CONCLUSION

For the aforementioned reasons, defendant's motion for summary judgment is granted as to all counts of the complaint, and the counterclaim is granted to the extent that the arbitration award is enforced against Century Canada only.

**22.** Rosvoorouzhenie also contends—without citing any legal authority—that the arbitration award should be enforced against Century USA. The Court declines to do so, because it "cannot enforce a judgment confirming an arbitration award as against a partner who is not a party to the arbitration proceedings." *Peterson v. Superior Bank FSB,* 242 Ill.App.3d 1090, 183 Ill.Dec. 491, 611 N.E.2d 1139, 1143 (1st Dist.1993); 47 Am.Jur.2d Judgments § 990. Moreover, "an undisclosed principal is discharged from liability upon a contract if, with knowledge of the identity of the principal, the other party recovers judgment against the agent who made the contract, for breach of the contract." Restatement (Second) of Agency § 210; *see Williams v. Investors Syndicate,* 327 Mass. 124, 97 N.E.2d 395, 396–97 (1951) (plaintiff cannot enforce against principal judgment that was obtained against agent).